The next case for consideration is Lexington Insurance Company v. Precision Drilling Company. It is docket 18-8072. Mr. Sobchak. May it please the court. Good morning, your honors. Good morning, counsel. My name is Mark Sobchak. I'm here on behalf of Apollon Cross-Apolli, Lexington Insurance Company. With the court's permission, I'd like to reserve two minutes of time for rebuttal. By way of this appeal, Lexington asks this court to reverse the district court's entry of summary judgment in favor of Precision Drilling and its insurers, declaring that Lexington owes them $3 million for settlement of an underlying personal injury suit. I'd like to make two points in support of that argument. The first point is that the plain language of the Lexington policy plainly requires Lexington's named insured, Upstream International, to perform worker operations for Precision for there to be any coverage. There is no evidence that that happened. Second, even if Precision were an additional insured or were entitled to additional insured coverage under the Lexington policy, that coverage should be limited to $2 million because the plain terms of the Lexington umbrella policy state that coverage is the lesser of the amount called for in the contract by which Precision becomes an additional insured or the amount stated in the declarations. Finally, I'd like to address Precision's cross-appeal. Insofar as the district court denied them recovery of attorney's fees and prejudgment interest, that was correct. The statute by which Precision sought attorney's fees and prejudgment interest is completely inapplicable because the Lexington policies were issued in Wyoming. Or I'm sorry, were not issued in Wyoming. They were issued in Texas. As far as common law prejudgment interest, the court was welcome at its discretion to deny that. Would your honors like some of the facts? We've read your briefs. Yeah. Okay. And you've got a lot of issues here and not very much time. I think you better go to your most important issue first because you raised a lot of things. Could I ask one question before you do that? You certainly can. Not just Mr. Jett. It seems rather ambiguous as to exactly who Mr. Jett was working for and who benefited from his activities. He was working for, I'm sorry. I know nominally he was not working for Precision, but there's an argument, it seems to me, that at least has some merit that he was, in fact, working for Precision because he was directing a lot of activities. It all seems very ambiguous to me as to exactly who was benefiting from Mr. Jett's activities. Well, I think it's important to remember Mr. Jett himself testified unequivocally he worked for Ultra, the leaseholder. Ultra contracted with Upstream, told them to hire Jett, they did. Separately and completely apart from that contractual strain, I guess we'll call it, they contracted with Precision to drill the well. Ultra assigned Jett to the well because it was underperforming. Jett was there as the company man for Ultra. In that function, if he saw something that was happening at that well site that was, for example, a safety violation or something that might lower the productivity of that well and cost his employer or his ultimate principal Ultra money, he'd point it out. But the evidence is clear that Ultra recruited him. Ultra hired him. He reported to Ultra management. He had no control over Precision personnel. Precision had no control over him. But there's evidence that he did control Precision personnel. Told them what to do, how to do it, when to do it. Which is not sufficient under the Lexington policy for coverage. Because it has to be work that the named insurer performs for the additional insurer. Meaning, it has to be work Upstream performs for Precision, which your Honor just described as the opposite of that. That would be work Precision performing for Upstream. And that's just simply not sufficient. So is your argument that whoever writes the paycheck, that's who you work for? Are you that limited? Or are you broader than that? I don't think it's necessarily that limited. And I don't think we need to get into the fine points and the outer boundaries of what it means. The policy says for that additional insurer. If you apply a common, ordinary, plain meaning, what does it mean to perform worker operations for someone? Well, why can't you say that means to benefit them? A conferral of a benefit? You're working for them because you're helping them. Otherwise, they're going to get run off of the job because they're being inefficient. And so the steps that Mr. Chan is taking are also to aid Precision in staying on the job site. I think there needs to be some manner of control. I think that's the key. Precision had to be able to control Gent. When you tell somebody in a common and ordinary meaning that I work for Mr. Smith, I believe there is an inherent common understanding that that means that Mr. Smith can tell me what to do. He can control my actions. And that's just not the case here. Gent was working as a company man for Ultra. Ultra owned the well. Precision separately contracted with Ultra to drill the well. Gent was there to advance Ultra's interests, and he was working for Ultra. He upstream, which functionally is Gent, there was no other upstream personnel at the site, at least for our purposes, never performed worker operations for Precision. Well, can't both of those readings be reasonable? In other words, you disagree with the district court, but the district court reads that language in a reasonable way. I don't believe it is reasonable, Your Honor. And I actually would point out it is an unpublished case from the Northern District of Florida. But if you look at the Roberts Sand case, this doesn't come up very often in case law. And part of that is because of the way the contract between Ultra and Upstream defines who needs to be named so broadly as including Ultra's other contractors. But the Roberts Sand case, which is the only case in the briefs that directly addresses this, says conferral of a benefit is not a reasonable reading of very similar language. And so, no, I do disagree with the district court on that point. I'm sorry. How do you distinguish Marathon, Ashland, Pipeline? Marathon is distinguishable, really, because we're not making the same arguments that the putative insured in Marathon made. Marathon, there were three arguments that the, I'm sorry, the insurer. There were three arguments that the insurer made in that case. It said that there's no coverage because what the injured employee was doing was outside the scope of the designated operations on the deck page. This court and the lower court just did not buy that argument, nor should it have. They then said that the actions did not arise out of the named insured's operations, which is kind of what precision is arguing. They're kind of, for lack of a better term, putting us in a straw man position. We're not arguing that this didn't arise out of Upstream's work. We're just saying that work was not for precision. And then finally, the third argument that was made in Marathon was that the incident had to arise from the named insured's sole negligence. We're not making that argument either. Marathon, in that case, is analogous to Ultra, not Precision. That's the difference. If you read Marathon, Marathon is the most analogous party to Ultra. There was an express contract between SSI and Marathon. If your honors wouldn't mind, I'd like to move to my next point, which is that even if this court does find that Precision is entitled to additional insured coverage, that coverage should be $2 million, not 3. And the reason is, if you look at Endorsement 3 of the Lexington Umbrella Policy, that plainly says that Lexington will pay on behalf of the person or organization the insured is obligated by a written insured contract to provide insurance for is the lesser of the limits of insurance shown in the declarations, which in the Umbrella Policy is $5 million, or the minimum limits of insurance you, meaning the insured, agreed to procure in the written contract. That's $1 million. It's right in Exhibit B to the Ultra Upstream contract. The district court held that Lexington forfeited this argument. But there's a couple problems with that. And the first problem is that what the district court's decision does is create coverage out of thin air. Doctrines like estoppel and waiver, and forfeiture is analogous to that, can't create coverage that doesn't exist. The policy limits here for Precision are $2 million. I have trouble with your analogizing that waiver thing. It seems to me that the waiver we're talking about here is failure to do what you needed to do in the court. Isn't that a little bit different from the waiver that you're talking about? Certainly there are differences. But the ultimate result is sort of the same, which is that it's creating coverage under a contract that the plain terms of the policy do not provide for. Well, that's one way to look at it. The other way to look at it is you waived it because you didn't do what you're supposed to do in a timely manner. And people face waiver for all sorts of reasons when they don't make arguments in a timely fashion. Well, Your Honor, that brings me to my second point, which was the district court ordered Precision to file an updated second summary judgment motion. And we raised the policy limits argument in response to that motion. When was that order given? That order was given following remand from the first appeal. Okay. But the judge's ultimate decision about waiver was your conduct before the remand. Correct. So whatever the judge did later should not have affected, in the judge's mind, didn't affect the fact you had already waived that point on the first go around by not asserting it. Well, I also would point out— The court said you don't get a do-over on things that are unrelated to the matters, you know, that we're considering now. Well, Your Honor, we would respectfully disagree. And I think that we did raise this in response to their second motion for summary judgment. But only after remand. Only after remand. Correct. Is there any reason it wasn't raised before remand? There's generally—my understanding is that I don't believe that there's a—it was attached to the complaint, the policy limit was listed in the complaint. It was there the entire time. I cannot give you a specific reason why it was not raised. Were you the attorney at that point? I was not. Okay. I'd like to briefly talk about Precision's cross appeal while I have a moment. And they are seeking statutory attorney's fees and prejudgment interest under Wyoming Statute 2615.124. That is part of the Wyoming Insurance Code. The Wyoming Insurance Code applies to policies issued or delivered in Wyoming. The Lexington policies were issued and delivered in Texas. So it is completely inapplicable, and the district court was correct in rejecting their request on that point. As for their request for common law prejudgment interest, it's interesting that Precision spent so much of their time in briefs about cabining the issues to what was raised before the first appeal. And their request for prejudgment interest was not raised until a reply brief on the second motion for summary judgment. In fact, the district court's order on deadline said the briefing is supposed to capture only those issues currently in dispute. And in response, Precision stated that only two issues remain to be decided. Whether Precision is an additional insurance, paraphrasing slightly, under the relevant insurance policies, and whether Precision Drill & Company is to be awarded interest and attorney's fees pursuant to Wyoming Statute 2615.124C. So, insofar as the district court decided that Lexington was precluded from raising a prior argument, based on his order of updated briefing on what is at issue, I don't see why the same should not apply to Precision. If you're reserving time, you need to do so up to your call. I will reserve what I have remaining, which is about a minute and a half. Thank you. May it please the court, counsel. Good morning, your honors. My name is Robert Walker. I'm an attorney at the law firm of Hickey & Evans. We represent Precision in the woods of London and the various woods of London carriers in this case. Why don't you raise the microphone a little bit and speak kind of close into it a little bit more. Will do. Thank you, your honor. Before beginning, I would like to take a moment today to thank your honors for traveling up to Laramie and thank the law school and its staff, the professors and the students for hosting us today. Your honors, this case could really be divided into two separate parts, the procedural components, how did we get here, and the substance of the case. And I want to hit the substance first because I believe strongly that we win on those substantive issues and I'd much prefer to win on those issues. So, I'm going to try to spend the majority of my time addressing those things. Could I ask you just a preliminary question about that? Yes, your honor. Isn't it true that the district court has a great deal of discretion in deciding what to do up until the time that a final judgment is entered? You know, even a rule 56, a rule 54 summary judgment might be an example of that. But the judge has a lot of discretion in revisiting issues, re-briefing issues, resurrecting issues during the trial until a final judgment enters. And our view of that is kind of abuse of discretion, right? Correct. I think that's the exact answer to that question is the review of... So the judge could have done it the other way and not abused his discretion. Correct. The review is abuse of discretion. So if he'd opened a wide open... There are some limits, of course, because it's on a remand, but... Correct, correct. The standard of review would be abuse of discretion and did he abuse his discretion in allowing in any particular arguments. In this case, were arguments sufficiently forfeited or abandoned such that allowing them back in would have been an abuse of discretion? And that's the standard under which this would be couched. I do believe the case of the estate of, and I'm going to mispronounce it, but it's Trentadue, T-R-E-N-T-A-D-U-E, applies kind of a scope of a remand that I think is generally appropriate for judges to follow, and it provides three areas where issues could be remanded or addressed post-remand. The first are those issues specifically remanded by the appellate court, which logically makes sense. The second is if that remand creates new issues that weren't present prior to that appeal, then those issues can be raised. And then the third area that this case establishes are those issues that were timely raised prior to the first appeal that still remain. So that case says that's the appropriate scope, and when the judge goes beyond that scope, then you have to decide whether it was an abuse of discretion or not. Here the mandate, it strikes me, is very broad. I didn't see a lot of limiting language. You're correct, Your Honor. Justice Gorsuch, in his opinion, says generally we readily recognize we have not addressed all the issues before the court. We remand, in particular, the issue of whether precision is an additional insured. For example, he said. For example. And the parties are free to go back and litigate those issues, I believe is the language used, or a close approximation thereof. So it is fairly broad in scope that way, where there isn't any limiting language. As to the first issue, and I believe it's the first issue raised by counsel for Lexington, is precision an additional insured? I sleep well at night knowing I don't create the facts. I didn't write these policies. Lexington drafted this policy. Lexington's the one that created this language. I just have been a little unclear. Is the sole argument whether precision is an additional insured, or is there an argument also whether gent was an additional insured? Your Honor, I don't recall seeing any discussion or argument as to whether gent was an additional insured. I believe the sole argument lies in was precision an additional insured. As to that point, I think it's helpful to go to the language used itself. I don't want to be clever with the words. I want to look exactly to what the policies and underlying contracts say. All of this starts with the ultra upstream contract. What did ultra and upstream contract for? At section 3.1, it says contractor being upstream, agrees to procure and maintain at its sole expense with solvent insurers, insurers acceptable to the company, which is ultra, policies of insurance in favor of the company upstream, its subsidiaries, affiliated and related companies, their working interest owners, co-lessees, co-owners, contractors and subcontractors, and any others for whom any of the foregoing may be acting. In other words, ultra is hiring upstream to bring the company man, the well site manager, out. As part of that contract says, you upstream, you're going to be managing the well site. You must procure insurance for everybody there. It's foreseeable. It's a dangerous location. It's foreseeable that harms could arise. You must procure the insurance. That takes us to the Lexington policy that upstream procured in honor of that contract. Endorsement 17A says who is an insured is amended to include any person or organization you are required to include as an additional insured on this policy by a written contract or written agreement in effect during this policy period. That ties in, pulls in the ultra upstream contract and says anybody under that contract that you're required to insure will insure. In fact, Lexington at page 36 of its primary brief admits precision is an additional insured. That's the language right out of their brief. The question here today isn't really is precision an additional insured. The question is, is the scope of that coverage broad enough to cover Jent's injury? That's where Lexington ties in 17B of their endorsements. Again, it's important to go to the language itself. Again, I don't want to be clever. The language itself says the insurance provided to the above described additional insured. Who's the additional insured? It's ultra and all its subcontractors and everybody that's there. Under this endorsement is limited as follows. The person or organization is only an additional insured with respect to liability arising out of your work or your product for that additional insured. Fortunately, the Wyoming Supreme Court has established a number of principles to help us understand what that might mean. First, it's important to note that interpretation of an insurance policy is a matter of law. Accordingly, Judge Johnson's decisions in relation to those matters would be reviewed de novo. The first policy that the Wyoming Supreme Court has given us to help interpret these types of contracts is the intention of the parties is the primary consideration and is to be ascertained, if possible, from the language employed and the policy viewed in light of what the parties must have reasonably intended. You go to the ultra upstream contract, what did the parties intend? They intended for protection for everybody at the well site. Words must be given their common and ordinary meaning. I'll get to that in a second. Significantly, language should not be so strictly construed as to thwart the general object of the insurance. In this case, I want to be clear, and sometimes after oral argument, I fester whether I made a point clear enough, so I respectfully request your honors to take note of this so that I can sleep tonight. If the language was accepted or the interpretation of Lexington was accepted, it would create illusory insurance. Let me explain why. First, they've admitted that they did provide precision insurance as an additional insurance. It's in their brief, it's uncontested, it's admitted. But yet in that same brief, they say there's no scenario under the facts of this case where precision could have been controlling the actions and activities of upstream because upstream's ahead of them on the chain of command. They're the ones directing precision. Therefore, there's no factual scenario under the facts of this case where precision could jump them and direct the activities. So under their own interpretation, they're telling you, we never intended to provide any coverage of any kind for these significant premiums we received for providing this coverage. Their interpretation creates illusory coverage. Next, because insurance policies do represent contracts of adhesion, if the language is ambiguous, the policy is strictly construed against the insurer. John Wayne is quoted as saying, and this is a tip of my hat to the universities, the world needs more cowboys. He says, if the world isn't black and white, I say, well, why the heck not? In this case, it's because if there is any ambiguity, Lexington drafted it that way. Finally, and a very significant case is the recent case as of April of 2019, which I believe came out towards the end of our briefing period. So it's American National v. Burns. Within that case, this court explained where policy language is fairly susceptible to two interpretations, two constructions. The interpretation favorable to the insured will be adopted. The court goes on to say that the court isn't interested or concerned with a definitive pronouncement of the best or most reasonable reading. What the court is concerned with is if there's any reasonable interpretation in favor of finding insurance, the court will find it, and that's in accordance with the Wyoming public policy. So it's our opinion that looking at the express language used in the policies, coverage is provided, looking at the words arising out of, the marathon case means that's just the natural consequence of, or a causal connection being readily apparent. Your work in this case is clearly upstream's work. They want Lexington's definition to accept their definition. Upstream had a general responsibility for everything that took place at that well site, didn't it? Correct. So your work from upstream's position would have been everything at that well site. It would have been. Exactly, Judge Ebell. They provided Gent as the company man to supervise everything. And in fact, his own deposition... Upstream. Actually, who paid Gent's salary? A fairly typical scenario in this type of... Not typical. What does the record show in this case, who paid Gent's salary? In this case, Gent was an independent contractor of Upstream. I know, but who paid for the, not salary, I've used that word wrong, who paid for his consulting fees? It's my understanding from the record that Upstream paid him as an independent contractor and Ultra paid Upstream for his services at the well site. So it was in the form of... You think there's record evidence that Gent's salary, the checks were signed by Upstream? I don't believe the record shows anywhere who the checks were signed by. Okay. I don't believe that would be in the record. I know there's, within the record, Gent's independent contractor agreement with Upstream. I think that's as close as the record gets. Okay. I think it's important to look at the activities that Mr. Gent was performing on the day of his injury. They're rigging down a well, which I understand is a fairly dangerous activity. They're pulling pins and lowering the derricks, and as he's stepping down off those steps, the bolts fail, the derrick falls. He's thrown off the rig. Why is he up there on the rig in the first place? He's directing and supervising precision personnel, telling them, this is how you do it. This is how you keep everybody safe. Nobody go over there. It's dangerous to be over there. Prior to the rig down, he holds two supervision meetings, just because he wants to make sure everybody does it right. So he's directing all these activities. To accept Lexington's interpretation, you have to look to that word for. That word for, they read that to mean under the supervision or control of, and they read that into their own policy. That's not there anywhere in the policy. I had a hard time finding a definition of the word for, but last night I pulled it up on Merriam-Webster. That means the object or recipient of an action. Did precision, were they the recipient of some action that day? Yes, they were. They were being supervised and told what to do by Mr. Gent. I have a short time left. I do want to get to the single aggregate endorsement issue, which is that $2 million versus $3 million. Again, I think it's important to look at the language used within the policy. Interestingly, Lexington wants your honors to accept a plain meaning of the word insured contract and use what might be commonly understood as an insured contract. That ignores the fact that they chose to go as far as to define that phrase within their policy. Their definition of that phrase contains the language, the part of any underlying contract or an underlying agreement, where you agree to indemnify somebody. That endorsement under their own terms, as they defined them, limits the applicability of that endorsement only to insured contracts. If your honors go back and review Justice Gorsuch's opinion on this first appeal, he says in there this has nothing to do with an insured contract. This is a separate insurance procurement clause, which is not voided by the anti-identity statute. Because of that, this endorsement simply doesn't apply to this case. Insurance arises independently of that. Your honors, I see I'm out of time, and I thank you. Briefly, your honors, first, as to the argument that coverage is illusory under the Lexington policy, I think what counsel is doing is counsel is using the ultra upstream contract to agglomerate ultra and its subcontractors. What the Lexington policy says as a personal organization, and it says that insured, it's specifically do somebody claim the coverage. The only party claiming coverage here is precision. And insofar as the Lexington policy does provide meaningful coverage, for example, had the ultra been sued here, I think there's no doubt they would have been entitled to coverage under the policy. Policy cannot be illusory if it covers some meaningful risk. And it does. And as to your honors, I'm sorry, as to the insured contract argument that counsel just made with respect to endorsement three, if you take that to its logical end, it would be almost impossible for, what counsel is saying is that an indemnity obligation is separate from an insurance procurement requirement, which it is. But if you take it to its logical end, the Lexington language in endorsement three would be rendered meaningless because even if those two requirements were in the same sentence, they're still separate. So the plain intent of endorsement three is if you're required by an insured contract or if you're an additional insured by an insured contract, the limits are the lesser of what's on the debt page or what you agreed to provide in the contract. I'll point your honors to the prime court case, which analyzes that it's plain, it's clear. I believe one of the other cases, the insured case we cited, said it was hard to even imagine more unambiguous language. So Lexington would respectfully ask that this court reverse or in the alternative modify the district court's decision. Thank you, your honors. The case is submitted. Thank you, counsel. Thank you.